UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INDECK POWER EQUIPMENT COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 21-cv-3519 |
| v. | ) ) | Hon. Steven C. Seeger |
| GRAPHIC PACKAGING, LLC, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Indeck Power Equipment Company rented a huge boiler to Defendant Graphic Packaging to power its plant in Louisiana. When the boiler came back to Illinois in bad shape, Indeck filed suit, seeking to recover both the repair costs and the loss of rental income in the meantime. Graphic Packaging moved to dismiss the complaint in part, challenging the demand for damages for lost rental income. Defendant's motion to dismiss (Dckt. No. 22) is hereby denied.

Indeck leased a superheater steam boiler to Graphic Packaging for an eight-month period at a rate of $54,100 per month. Under the lease, Graphic Packaging agreed to "return the Equipment in the same condition as it was received." *See* Lease, at ¶ 3 (Dckt. No. 1-1).

The lease included a few provisions that covered what would happen if the boiler suffered damage. For starters, Graphic Packaging agreed to pay for any repairs: "In addition to the rental payments, Lessee shall pay Lessor for the cost of all repairs and replacement parts regardless of the cause or type of damage or wear, other than those resulting from (i) ordinary wear and tear . . . ." *Id.* at ¶ 4.

Graphic Packaging also agreed that it would continue to pay rent – even after the eight-month period – if it returned the property in a damaged condition. "In the event that the Equipment is returned by Lessee upon the expiration or termination of this Lease with damage to the Equipment for which Lessee has liability pursuant to Section 4 herein, including but not limited to missing parts, in addition to recovering all costs associated with the repair or replacement of the damaged Equipment, *Lessor shall be entitled to continued rental payments under the terms and conditions of this Lease until such time as the Equipment is repaired or replaced*, with such rental payments being calculated on a monthly basis, with Lessee paying Lessor a full month's rent for each month, or prorated portion for any fraction thereof, that the Equipment is being repaired or replaced." *Id.* at ¶ 5 (emphasis added). So, if the boiler was damaged, Graphic Packaging agreed to pay for the repairs, plus the loss of rental income in the meantime.

According to the complaint, Indeck received the boiler at the end of the period and discovered that it was badly damaged. Indeck sent the boiler for repairs, and then filed suit against Graphic Packaging to cover its losses. It seeks the repair costs, plus "rental payments during the repair of the Boiler." *See* Cplt., at ¶ 15 (Dckt. No. 1).

Graphic Packaging, in turn, moved to dismiss the complaint in part, and relies on Illinois law (which governs in light of a choice-of-law provision). Graphic Packaging challenges the demand for the loss of rent, on two grounds.

First, Graphic Packaging argues that lost rental income is not recoverable in a breach of contract claim when the lessor also recovers repair costs. *See* Def.'s Mem., at 7 (Dckt. No. 23) (arguing that the Seventh Circuit "expressly holds that lost rental income while a product is

2

being repaired following a lessee's return of the product cannot be recovered as contract damages").

Second, Graphic Packaging argues that the lost monthly income is an unenforceable penalty. In a worst-case scenario, Indeck could drag its feet in fixing the equipment and thus "liability could continue forever." *Id.* at 6.

Both arguments rest heavily on the Seventh Circuit's decision in *Linc Equipment Services, Inc. v. Signal Medical Services, Inc.*, 319 F.3d 288 (7th Cir. 2003). There, Linc leased an MRI machine to Signal Medical, and the machine suffered damage during transit on its return. Linc sought the repair cost of $130,000, plus the loss of rent for the 10 months (at the monthly rental rate of $30,000, for a total of $300,000) when the machine was out of service. *Id.* at 289. After fixing the machine, Linc sold it for $475,000. *Id.* at 291.

The district court granted the lessee's motion for summary judgment, concluding that the loss of rent was not "expressly contemplated" and thus was not recoverable as "consequential damages." *Id.* at 289.

The Seventh Circuit rejected both parts of that rationale. Judge Easterbrook explained that consequential damages only need to be "reasonably foreseeable," not "expressly contemplated," under the predominant case about the recovery of consequential damages, *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854).

Then, the Seventh Circuit explained that the loss of rent isn't properly categorized as consequential damages. "What is more, it is hard to see why income lost because of inability to rent a chattel should be classified as 'consequential' damages at all." *See Linc*, 319 F.3d at 290.

That statement provided important context for everything that followed. Everything else in the opinion explained that overarching point. The Seventh Circuit took the time to explain

3

why a loss of rental income isn't really consequential damages in this context, because the loss of rental income is baked into the decline in value of the good.

At that point, the Seventh Circuit expounded on the proper standard for damages when a case involves damaged rental property. The gist is that damages should equal the reduction in the value of the property in question. And that reduction in value necessarily takes into account both the costs of repair *and* the loss of any rental income. *Id.*

The Seventh Circuit framed the issue by considering what the lessor could get if it sold the damaged property. Damages would equal the delta between the value of undamaged property and the value of the damaged property. The economic loss is the loss of value if the owner had sold the property. *Id.*

"The difference between what the MRI would have fetched in a sale immediately after its return in damaged condition, and what it could have been sold for had Signal kept its promise to return it in good condition, is the real economic loss caused by transporting the machine." *Id.*

The lessor could not recover that loss in value *plus* lost rental income, because the loss in value already took future rental income into account. "Because the market price of rental equipment capitalizes the expected rental stream – not only reducing cash flows to present value but also taking into account the probability that some months will not fetch rentals, when machines are between customers or demand is slack – it would be double counting to award a lessor anything extra for lost rental income." *Id.* at 290. The phrase "anything extra" referred to lost rental income *on top of* the decline in market value, because the decline in market value already would take into account the loss of future rental income.

Judge Easterbrook teased out a few examples of how that principle might apply, including a colorful example involving a Hertz rental car. "Consider what should happen if one

4

of Hertz's customers has an accident and the car must be taken out of the fleet for a month while being repaired. Would Hertz recover not only the cost of repair (say, $1,000) but also the $50 daily rental during that month ($50 x 30 = $1,500)? Such a measure frequently would overcompensate the lessor." *Id.*

The hypo assumed that Hertz could sell the damaged car, and buy a different car that was comparable to the undamaged car (and pay the delta between the damaged car's value and the undamaged car's value). Then, Hertz could rent the new undamaged car, and could recover the "difference in resale prices" as damages.

A lot of assumptions were baked into that hypothetical, including the lack of transaction costs, the immediacy of the transactions, the availability of markets, and so on. Putting that aside, the point was that the lessor can't recover lost rental income if the measure of damages already takes into account the economic value of leasing the property.

Take a close look at the last sentence of the passage in question: "Such a measure frequently would overcompensate the lessor." *Id.* The adverb – "frequently" – does more than its fair share of the work in that sentence. The word "frequently" does not mean "necessarily" or "inevitably." There might be double counting. Or maybe not.

The key point is that the non-breaching party cannot recover more than its losses. The non-breaching party cannot recover a second measure of damages (*i.e.*, loss of rental income) if another measure of damages (*i.e.*, decline in value, because present value includes the opportunity to rent the equipment in the future) already captures that loss.

Judge Easterbrook went on to explain that the proper measure of damages must take into account whether the loss of rental income is gone, or is merely deferred. "One must consider as well the possibility that MRI machines have lives that depend on accumulated use (wear and

tear) rather than technological obsolescence. In that event, taking the machine out of service did not cost Linc ten months rental but only postponed its receipt." *Id.*

To cement that point, this Court offers the following examples. Imagine if a company leased a computer to a consumer for 12 months, and, because of technological advances, the computer would be obsolete and unusable in three years (including the 12 months of the lease). So the leasing window is open for only 36 months. After that point, no one would want the out-of-date computer.

Imagine if the clumsy renter tripped on the lessor's doorstep and dropped the computer on the last day of the rental period. At that point, the computer had only 24 months of useful life left in the can. And then, suppose that the computer company needed to spend $500 to fix it and couldn't rent it to anyone else for six months.

In that case, the computer company lost $500 in repair costs, and lost the ability to obtain rental income for six months of the remaining 24 months of the 36-month lifespan. The computer company would be left with only 18 months to rent the computer to someone else. The loss is the repair costs, plus the lost rental income. Putting it another way, if the renter had not been so clumsy, the computer company would not have spent $500 to fix it, and would not have lost rental income for six months.

In a world without transactions costs, the computer company could sell the computer on the day of the smash. The value of the computer would reflect the fact that the buyer would have to spend $500 to fix it, and couldn't rent it to anyone else for 6 months (leaving a possible future stream of rental income totaling only 18 months). In that case, the computer company could not recover the delta between the value of the unsmashed computer and the sale price of the smashed

6

computer, *plus* lost rental income, because the delta already included the loss of rental income for six months.

On the other hand, imagine renting a wheelbarrow, which hasn't received a technological upgrade in 3,000 years. They're always handy, and never out of date. Imagine if a wheelbarrow had a lifespan of 1,000 hours of hauling bricks and rocks before it would inevitably break down. And imagine if the same clumsy person broke the wheelbarrow on the last rental day (right after going to the computer store, to boot), and it would cost $500 and six months to fix it.

In that situation, the lessor would lose repair costs, and would lose rental income *for the time being*. But once the wheelbarrow was fixed, the lessor could rent it again. The lost income would simply be the present value of the deferred payments (*i.e.*, the lessor will get money later than it otherwise would have, because the repairs delayed future rents by six months).

The lessor of the wheelbarrow would not suffer a loss of rental income in the same way that the lessor of the computer would suffer a loss of rental income. While the wheelbarrow was in the fix-it shop, it wasn't hauling bricks. So, from a lifespan standpoint, the clock was stopped. The lessor retained the future ability to rent it out for whatever was left in its 1,000-hour lifespan. The wheelbarrow will break down at some point (when its 1,000 hours are up), and the clumsy person's accident merely postponed that break down.

But the lessor of the computer is differently situated. Every day of lost rental income is a day that isn't coming back. If the computer can't be leased for a month, the lessor can't recoup that money later because the product has a lifespan – a fixed lifespan of three years, before its useful life ends.

Taking a step back, and viewing *Linc* as a whole, the Seventh Circuit basically explained that the common law of contracts does not allow double dipping. It elaborated on that point as

part of an effort to explain why the loss of rental income isn't consequential damages, because the decline in value of the rental property already takes into account lost future rental income.

With all of those principles and illustrations in mind, this Court offers a few thoughts.

First, the Court does not read the Seventh Circuit's decision in *Linc* to declare a bright-line rule against the recovery of rental income when the non-breaching party seeks repair costs, too. It depends on the facts. The key point is that the lessor cannot achieve a double recovery.

It is too strong to read *Linc* to categorically bar any recovery above and beyond repair costs. In fact, the last paragraph of the opinion makes that very point. "So the district court was right to conclude that Linc is not entitled to damages measured by the monthly rental times the number of months required for repair, but wrong to think that the cost of making repairs sets a cap on damages." *Id.* at 291.

This Court understands the first part of that sentence to mean that Linc was not *necessarily* entitled to monthly rental income, because it might overcompensate the lessor. The second part of the sentence is enough to dispose of the motion to dismiss: the "cost of making repairs" does not "set[] a cap on damages." *Id.*

The Seventh Circuit found that damages totaling $300,000 for 10 months of lost rent would have been "excessive," given the actual sale price of $475,000. *Id.* at 291. But that's different than saying that damages for loss of rent are categorically out of bounds.

Second, the Seventh Circuit in *Linc* analyzed the situation in the context of a motion for summary judgment, not a motion to dismiss. *See Linc Equip. Servs., Inc. v. Signal Med. Servs., Inc.*, 1999 WL 1144919 (N.D. Ill. 1999). Here, in contrast, the Court is faced with a motion to dismiss. The Court has allegations, but no facts. And the facts of the case could shed

considerable light on whether any portion of the demand for lost rental income is, in reality, a double recovery.

The parties have not yet embarked on discovery, so the Court has no information about the boiler's market utility. Has Indeck's rental income been lost forever, or is it merely postponed? Is the boiler more like the computer or the wheelbarrow? Maybe technological obsolescence is a real threat to boilers, or maybe not. The Court doesn't know based only on the complaint. Without a record containing real-world facts, this Court isn't inclined to categorically prohibit lost rental income.

Third, the point in *Linc* about the reduction in the value of a piece of property is abstract, to put it mildly. This Court fully appreciates the point that the reduction in value is the real economic loss. But applying that principle here, in the context of a motion to dismiss – without any information about a potential sale price, or a decline in the value of the boiler – is more than a little difficult.

The Seventh Circuit ruled that the non-breaching party cannot recover both the decline in value *and* the loss of rental income, because the decline in value would take into account the loss of rental income. True enough. But here, on a fact-free record, this Court cannot apply that principle in any way that moves the ball forward.

When it comes to deciding cases, the concrete triumphs over the abstract. And here, this Court has abstract principles that don't do the Court much good on a motion to dismiss.

Fourth, the case at hand is different than *Linc* in another important way. In *Linc*, the Seventh Circuit applied common law principles about damages for breach of contract. The contract in question did not appear to say, one way or the other, whether the lessor could recover the loss of rental income plus repair costs.

9

But here, in sharp contrast, the agreement did that very thing. The parties expressly agreed that the lessor could recover lost rental income while repairing the damaged boiler. *See* Lease, at ¶ 5 (Dckt. No. 1-1). Without that agreement, Indeck as the lessor may have priced the rental fees differently. Maybe Indeck would have increased the monthly rental rate as a hedge, to account for the fact that it might lose rental income if the boiler got damaged.

On the flipside, maybe Graphic Packaging paid a lower rental rate because it also agreed to continue paying if the boiler suffered damage. And if Graphic Packaging pocketed a lower rate based on its agreement to keep paying if the boiler suffered damage, it is hard to see why the Court should not hold Graphic Packaging to its end of the bargain.

All of this analysis is a long way of saying that a motion to dismiss isn't the best platform for deciding what type of damages Indeck can recover. A lot will turn on the facts, which the Court has not yet heard. In the meantime, the motion to dismiss is denied.

Date: September 6, 2022

Steven C. Seeger
United States District Judge